# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| INGRID FISHER, INDIVIDUALLY AND AS | § | |
| SUCCESSOR IN INTEREST TO DECEDENT, | § | |
| STEVEN FISHER, *ET AL*, | § | [REDACTED VERSION FOR |
| *Plaintiff*, | § | CM/ECF FILING] |
| | § | |
| v. | § | CIVIL ACTION H-05-1731 |
| | § | |
| HALLIBURTON, INC., *ET AL*, | § | |
| *Defendants*. | § | |

## MEMORANDUM AND ORDER

Pending before the court is defendants' motion to dismiss.[1] Dkt. 135.[2] After considering the parties' arguments, exhibits, and the applicable law, the court concludes that the case presents a non-justiciable political question. Accordingly, the court lacks jurisdiction to hear this case. As such the defendants' motion to dismiss is GRANTED.

## BACKGROUND

In 1985, as part of a program to augment Army forces, the United States Army implemented the Logistics Civil Augmentation Program or LOGCAP.[3] Under LOGCAP,[4] the Army awarded

---

[1] The defendants filing the motion are Halliburton Company; Kellogg, Brown & Root, Inc.; Service Employees International, Inc.; Kellogg, Brown & Root Services, Inc.; DII Industries, LLC; and Kellogg, Brown & Root International, Inc.

[2] The memoranda in support and in opposition to the motion are filed with the court under seal. Dkts. 139, 140, 141, 149, 153, 155, 156, and 159. Additionally, the defendants filed a notice of supplemental authority, and plaintiffs responded, both not under seal. Dkts. 160 and 161.

[3] Dkt. 141, Exhibit B, at 1-1. The purpose of LOGCAP was to replace some services

1

Brown & Root Services (KBR) contract No. DAAA09-02-D-0007 to provide essential services in support of the military in Iraq.[5]  Military Task Orders 43 and 59 defined KBR's specific tasks, including the transportation services at issue in this case.  To fill the jobs created by the contract, KBR recruited civilian personnel.  KBR hired the plaintiffs[6] as part of a group to provide transportation services.  After terminating their current employment, the plaintiffs were transported to Iraq and assigned to Camp Anaconda.[7]

On the morning of April 9, 2004, upon arriving at the convoy staging area, the plaintiffs learned the planned route for that day had been changed.  The new route called for the convoys to

_____

currently performed by Army personnel with civilian contractors.  *Id.*  Those Army personnel would then be available for other missions.  *Id.*

[4]  The court used definitions of Army terms and acronyms from the Records Management and Declassification Agency website.  This database is available to the public at http://www2.arims.army.mil/abbreviation/MainMenu.asp.

[5]  Dkt. 141, Exhibit C.

[6]  The plaintiffs are the personal representatives of the deceased drivers, Steven Fisher, Timothy Bell, William Bradley, Steven Hulett, Jack Montegue, Jeffrey Parker and Tony Johnson.; the injured drivers, Michael Brezovay, Nelson Howell, Jackie Lester, William Peterson, Edwards Sanchez Jr., Calvin Keith Stanley, Raymond T. Stannard, Ricky L. Tollison, Danny R. Wood, and James Blackwood; and their families.  Although not all of the plaintiffs were truck drivers in Iraq, the court will use the term "the plaintiffs" throughout to mean either the truck drivers or those bringing the action according to context.

[7]  *See,* Dkt. 74.

deliver fuel to Baghdad International Airport (BIAP).  BIAP was an unfamiliar destination for the drivers.[8]  Many drivers merely followed the vehicle directly in front of them, who in turn, followed the Army's local Iraqi guide.[9]  According to the Army report of the incident, military personnel, including six gunners, accompanied the plaintiffs' convoy.[10]  Even so, the plaintiffs were the majority of the KBR manpower for the first of two convoys.  The first convoy was attacked by anti-American forces and sustained heavy casualties. Six men were killed, eleven more were seriously wounded, and one man is still missing and presumed dead.[11]

The plaintiffs originally filed their claim in Harris County District Court in April, 2005.  Dkt. 1, Tab 2.  The defendants timely removed the case to federal court on May 13, 2005.  The plaintiffs' most recent complaint alleges, among other things, that (1) the defendants' recruitment activities included knowing fraudulent statements regarding the safety and nature of the civilian work in Iraq in order to induce plaintiffs to accept employment, (2) the defendants knowingly and intentionally deployed the first April 9th civilian convoy as a decoy into an area they knew to be under attack to ensure the safe passage of the second convoy, and (3) the defendants had complete control over the decisions of when, where and how to deploy civilian convoys.[12]  Their causes of action include state law fraud claims, wrongful death, intentional infliction of physical and emotional distress, violations

---

[8]   Dkt. 141, Exhibit A-A, at 3-9.

[9]   *Id.*

[10]   *Id.*

[11]   Dkt. 74, at 26.

[12]   Dkt. 74, at 26.

3

of civil rights under § 1983, R.I.C.O., conspiracy, survivorship, and common law civil conspiracy. As a result they seek compensatory and exemplary damages.

The defendants respond that the Army had control over the deployment and protection of convoys.[13] They argue that since their decisions are so interwoven with Army decisions, the court lacks jurisdiction over the case under the political question doctrine.[14] The court agrees.

## POLITICAL QUESTION

A case may meet every other jurisdictional and justiciability hurdle and still be barred by the presence of a political question. *Vieth v. Jubelirer*, 541 U.S. 267, 277, 124 S.Ct. 1769, 1776 (2004). "Sometimes, [] the law is that the judicial department has no business entertaining the claim of unlawfulness." *Id.* "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221, 230, 106 S.Ct. 2860, 2866 (1986). Based on the concept of the separation of powers, political questions are addressed and redressed by the people through the political process.[15] *See Occidental of Umm Al Qaywayn v. Certain Cargo*

---

[13] Dkt. 140.

[14] *Id.* They also argue that they are entitled to official immunity, and alternatively that the plaintiffs' only legal recourse is defined under the Defense Base Act, 42 U.S.C. § 1651 (a). *Id.* The court does not reach those issues, since its determination that it lacks jurisdiction renders them moot.

[15] The court notes that the political process has begun to address the very issues raised in this case. Congress has shown interest in contractor safety in Iraq. The Senate Democratic Policy Committee has just recently conducted "a hearing about contracting abuses." *See, e.g.,* David

4

*of Petroleum*, 577 F.2d 1196, 1203 (5th Cir. 1978). The Supreme Court has set out a list of six formulations to aid courts in a "discriminating inquiry into the precise facts and posture of the particular case." *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710 (1962).

> (1) Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department;
>
> (2) or a lack of judicially discoverable and manageable standards for resolving it;
>
> (3) or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;
>
> (4) or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;
>
> (5) or an unusual need for unquestioning adherence to a political decision already made;
>
> (6) or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* "[O]ne of these formulations [must be] inextricable from the case at bar." *Id.* Here the nature of the litigation implicates several of the *Baker* formulations.

**1.     Textual Constitutional Commitment to a Coordinate Branch.**

The first and arguably most important formulation is a "textually demonstrable constitutional commitment of the issue to a coordinate political department." *Id.* The Constitution allocates the power of Commander in Chief of the United States Army and Navy to the executive branch. U.S. CONST. art II, § 2, cl. 1. Additionally, the Constitution gives the power "[t]o raise and support Armies . . . provide and support a Navy [and to] make Rules for the Government and Regulation of

_____

Ivanovich, *Halliburton Ignored Dangers, Drivers Say*, Houston Chronicle, Sep. 18, 2006, *available at* http://www.chron.com/disp/story.mpl/headline/biz/4196908.html.

the land and naval Forces" to Congress. *Id.* at § 1, cls. 12-14. "Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense." *Tiffany v. United States*, 931 F.2d 271, 277 (2d. Cir. 1991). Moreover, making war in a foreign land also implicates another equally compelling executive branch power, foreign policy. *Baker*, 369 U.S. at 211, 82 S.Ct. at 707. "Not only does resolution of [foreign policy] issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand [a] single-voiced statement of the Government's views." *Id. See also Occidental*, 577 F.2d at 1203 ("[I]n the realm of foreign relations, policy considerations render issues incompetent for a decision by the court."); *Dickson v. Ford*, 521 F.2d 234, 236 (5th Cir. 1975) (per curium) (finding conduct of foreign relations to be constitutionally committed to the executive and legislative branches.).

The Constitution mandates that war and foreign policy are the provenance of the Executive. In recognition of this, courts have consistently held that issues involving war, and actions taken during war, are beyond judicial competence. *See, e.g., Rostker v. Goldberg*, 453 U.S. 57, 66, 101 S.Ct. 2646, 2652 (1981) (selective service registration for men, but not women) ("The operation of a healthy deference to legislative and executive judgments in the area of military affairs is evident in several recent decisions of this Court."); *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 2446 (1973) (training of National Guard troops) ("[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence."); *Farmer v. Mabus*, 940 F.2d 921, 923 (5th Cir. 1991) (adjutant general's discharge after court-martial) ("[J]udicial intrusion into military matters is to be most cautiously and charily approached. . . . [T]he judicial process is manifestly ill-suited for the resolution of most of the myriad disputes which arise in that field."); *Bynum v. FMC Corp.*,

770 F.2d 556, 562 (5th Cir. 1985) (government contractor defense) ("It has long been recognized that interference by civilian courts with military authority inevitably raises both questions about judicial competency in this area and separation of powers concerns."); *Tiffany,* 931 F.2d at 277 (military decision to shoot down potentially hostile aircraft) ("The strategy and tactics employed on the battlefield are clearly not subject to judicial review.").

If the Army were the defendant, then the commitment to a coordinate branch would be reasonably clear. However, the plaintiffs argue that the defendants may not shelter under the political question doctrine, because the plaintiffs' complaint (1) "involves claims by civilians, not military personnel," (2) "questions Defendants' actions as civilian contractors, not the Army's execution of a mission;" and (3) alleges that "Defendants, not the Army, [] deployed, directed, and controlled the civilian members of the Hamill Convoy,[16] thereby making inquiry into military decisions and rules of engagement unnecessary."[17]   Even assuming the court found this statement to be true, the private character of the actions do not preclude the application of the political question doctrine. "Whether an issue presents a non-justiciable political question cannot be determined by a precise formula." *Saldano v. O'Connell*, 322 F.3d 365, 368 (5th Cir. 2003). The inquiry as laid out in *Baker* requires the court to posit whether a political question will arise during the course of the trial, not whether it is evident from the face of the complaint. *Occidental*, 577 F.2d at 1202. The political question "doctrine is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government; the identity of the *litigant* is immaterial to the

---

[16] Mr. Hammill was the lead KBR civilian truck driver for the first convoy on April 9th. He is not a party to this suit. Dkt. 74, at 26.

[17] Dkt. 149, at 34-35.

7

presence of these concerns in a particular case." *United State v. Munoz-Flores*, 495 U.S. 385, 394, 110 S.Ct. 1964, 1970 (1990). Here, the court finds that it cannot try a case set on a battlefield during war-time without an impermissible intrusion into powers expressly granted to the Executive by the Constitution.

**2.     Lack of Judicially Discoverable and Manageable Standards.**

The second *Baker* formulation is equally implicated. "One of the most obvious limitations [on the court] is that judicial action must be governed by *standard*, by *rule*." *Vieth*, 541 U.S. at 278, 124 S.Ct. at 1777. Those standards are particularly elusive in the case at bar, where the court cannot escape an examination of Army decisions, an area "not subject to judicial second-guessing." *In re Agent Orange Product Liability Litigation*, 818 F.2d 204, 206 (2d. Cir. 1987). In the case at bar, the question becomes whether the court could extricate the defendants' acts from the Army's acts.

A review of the evidence submitted by the plaintiffs and the defendants shows the actions taken on April 9, 2004 were, at best, the result of a joint effort between the defendants and the Army. The contracts show that the Army, not the defendants, was responsible for the security of the convoys, up to and including the force protection for the trucks,[18] the intelligence regarding the

---

[18]     LOGCAP Contract # DAAA09-02-D-0007 governing the relationship between the defendants and the Army states in relevant part:



Dkt. 141, Exhibit C, at 00004. For an identical provision under Task order 59, see Dkt. 141, Exhibit C, at 00076.

possible routes,[19] the decision regarding which route to take,[20] and the manner in which the drivers were to operate.[21] The Army's investigative report regarding the incident amply demonstrates the Army's significant actual involvement in the events at issue.[22] Moreover, in a deposition taken by the plaintiffs, ████████████████████████████████████████████████ ████████████████████████████ confirms that the Army chose the routes for the convoys and

---

[19] Task Order 59 dictates with regards to the transportation mission that ███████████████ ████████████████████████████████████████████████████████ Task Order 59, Dkt. 141, Exhibit C, at 00066.

[20] Under the Logistics Support Element of Task Order 59, the contract states that ██████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████ Task Order 59, Dkt. 141, Exhibit C, at 00075.

[21] ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████ Task Order 59, Dkt. 141, Exhibit C, at 00081.

[22] Dkt. 141, Exhibit A, at 3-9. ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████ *Id.* at 4. ████████ ████████████████████████████████████████████ *Id.* at 5.

9

requested that they be sent.[23]  Also, email among KBR employees during the time before, during and after the April 9th incident indicate that the Army had a significant role in the deployment of convoys.[24]  Regardless of whether the evidence may show that KBR had any ability to deploy or recall convoys, it most certainly demonstrates that the Army was involved at each step in the process.

The plaintiffs argue that the contract language required the defendants "to manage and direct their own convoys."[25]  They point to the Army publication, "Contractors on the Battlefield" and quote it as follows:

> Management of contractor activities is accomplished through the responsible contracting organization, not the chain of command.  Commanders do not have direct control over contractors or their employees (contractor employees are not the same as government employees); only contractors manage, supervise, and give directions to their employees.[26]

However, this quote is malapropos.  It was taken from the Overview section of the manual in a subsection entitled Contractor and Military Distinctions.[27]  A review of the manual reveals other, more applicable passages.

---



[23]  Dkt. 147, Exhibit U, at 17-18. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

[24]  *Id.*, Exhibit O, at 1. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

[25]  Dkt. 149, at 33.

[26]  *Id.*

[27]  Dkt. 149, Exhibit W, at 1-7.

Contractor Management in the Military Environment
[T]he regional combatant commander . . . is responsible for accomplishing the mission and ensuring the safety of all deployed military, government civilian, *and contractor employees* in support of US military operations. . . . To fully integrate contractor support into the theater operational support structure, proper military oversight is imperative.[28]

And later under the Force Protection chapter, the manual states:

Roles and Responsibilities
6-4. Protecting contractors and their employees on the battlefield is the commander's responsibility. When contractors perform in potentially hostile or hazardous areas, the supported military forces must assure the protection of their operations and employees. The responsibility for assuring that contractors receive adequate force protection starts with the combatant commander, extends downward, and includes the contractor.

•     •     •

6-6. Protection for contractors involves active use of armed military forces to provide escort or perimeter security, and passive measures that include protective military equipment, training, and equipping of contractor employees in self-protection.[29]

Far from supporting the contention that KBR had sole control over the safety of its convoys, the manual offers express proof that security started with the Army. The plaintiffs also quote from Army Regulation 715-9 to support the argument that under the governing contracts the Army was not allowed to direct KBR employees.[30] "Contracted support service personnel shall not be supervised or directed by military or Department of the Army (DA) civilian personnel."[31] Again, a closer examination of the regulations demonstrates instead that the Army was, at the very least, significantly involved in transportation and force protection decisions.

_____

[28] *Id.* (emphasis added).

[29] *Id.* at 6-2.

[30] Dkt. 149, at 33.

[31] *Id.*

11

> The Commander, AMC will . . . [c]oordinate transportation (i.e., to, from and within the theater), quality of life issues and force protection of deployed AMC contractors with the ASCC [Army Service Component Command].
>
> •        •        •
>
> [C]ontractor employees will be expected to adhere to all guidance and obey all instructions and general orders issued by the Theater Commander.[32]

The evidence shows overwhelmingly that the Army was an integral part of any decision to deploy and protect convoys.

In order to hear this case, the court would have to substitute its judgment for that of the Army. For example, the court would need to determine what intelligence the Army gave to KBR about the route, whether that intelligence was sufficient, what forces were deployed with the convoys, whether they were sufficient, and whether they performed properly.[33] Even if KBR had authority to deploy or recall the convoys, the court would still need to determine whether the Army could or should have countermanded that order. No judicial standards exist for making these determinations. To accept the plaintiffs' contentions that the defendants were in complete control of military vehicles transporting military supplies through a combat zone would require the court both to suspend disbelief and to disregard the governing contracts and the army incident report. This feat the court is simply not prepared to attempt.

Even if the plaintiffs limited their arguments to what KBR did or did not do, eventually the court would be forced to distinguish between KBR's actions and the Army's actions. Because the defendants present a colorable argument based precisely on this distinction, the court would inexorably be drawn into an examination of Army decisions. And, the Army's decisions during a

---

[32] Dkt. 149, Exhibit X, at 14.

[33] *See*, Dkt. 74.

time of war present a particularly inappropriate question for judicial examination. *Tiffany*, 931 F.2d at 276 ("It would [be] unseemly for a democracy's most serious decisions, those providing for common survival and defense, [to] be made by its least accountable branch of government.").

Finally, the textual commitment of military decisions to coordinate branches, as discussed earlier, has an inverse relationship to the lack of judicially discoverable and manageable standards for resolving the case. *Nixon v. United States*, 506 U.S. 224, 228-29, 113 S.Ct. 732, 735 (1993). The more a decision is committed to another branch or branches of government, the less likely a court will find judicially discoverable and manageable standards to apply. *Id.* The Constitution specifically gives the Executive Branch the role of Commander in Chief of the Army. U.S. CONST. art II, § 2, cl. 1. The Army's actions and decisions in Iraq set the stage for this case. Every issue, every claim the plaintiffs make must be examined against the backdrop of battle. They are inextricably intertwined. Accordingly, the court finds that it lacks the standards to hear this case.

**3.     Nonjudicial Policy Determination and Lack of Respect.**

If the second formulation asks the court to determine what happened on April 9, 2004, then the third formulation requires an examination of why it happened. In the broadest sense, the Executive Branch policy of using civilian contractors to free up military personnel for military missions would be under scrutiny. In the narrowest sense, the question would become why the defendants and the military sent two convoys on the road to BIAP on that fateful day. Is it wise to use civilian contractors in a war zone? Was it wise to send the convoy along the route to BIAP on April 9, 2004? Answering either question and the many questions in between would require the court to examine the policies of the Executive Branch during wartime, a step the court declines to

take.  Courts are "not tribal wisemen dispensing divinely or theoretically inspired judgments, but [are] limited to the application of predetermined law."  *Occidental*, 577 F.2d at 1203.

## CONCLUSION

The court concludes that this case presents a  non-justiciable political question.  The case at bar meets not one, but three of the formulations described in *Baker v. Carr*.  *See Baker*, 369 U.S. at 217, 82 S.Ct. at 710.  Nor is the court alone in this conclusion.  Two recent federal court cases involving suits against civilian contractors in Iraq were dismissed on similar grounds.  In a case involving the bombing of a dining facility managed by KBR for the Army in Iraq, Judge Sim Lake dismissed the case for want of jurisdiction based on political question.  *Smith v. Halliburton*, No. 4:06CV0462, 2006 WL 2521326, (S.D. Tex Aug. 30, 2006).  Also, in a Georgia case, the district court dismissed as non-justiciable a negligence case brought by the family of a U.S. soldier killed by a suicide bomber while escorting a KBR convoy.  *Whitaker v. Kellogg Brown & Root*, No. 4:05-CV-78, 2006 WL 1876922, (M.D. Ga. July 6, 2006).

For the foregoing reasons the court finds that it lacks jurisdiction to hear the above-styled case, because it presents a non-justiciable political question.  Accordingly, the defendants' motion to dismiss is GRANTED.  Dkt. 135.  The case is DISMISSED for want of jurisdiction.

It is so ORDERED.

Signed at Houston, Texas on September 22, 2006.

_____
Gray H. Miller
United States District Judge

14